IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIXION, INC., | No. C 09-03496 SI |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| CITRIX SYSTEMS, INC., | |
| Defendant. | |

On October 5, 2011, the Court held a *Markman* hearing regarding the construction of certain disputed claims in five patents owned by plaintiff. Having considered the arguments of counsel and the papers submitted, the Court construes the disputed claims as follows.

**BACKGROUND**

**1.    Procedural Background**

Plaintiff Pixion is a company formed in 1995 that focuses on developing "cost-effective interactive online meeting environments such as web conferencing solutions." Second Am. Compl. at 2. Plaintiff alleges that defendant Citrix Systems "makes, uses, offers to sell, and sells in the United States and imports into the United States online conferencing and collaboration systems" that infringe various patents belonging to plaintiff. *Id.* at 5. Specifically, plaintiffs allege infringement of five patents: U.S. Patent Nos. 7,369,515 (the "'515 Patent"), 7,426,191 (the "'191 Patent"), 7,715,331 (the "'331 Patent"), 7,813,304 (the "'304 Patent"), and 7,877,489 (the "'489 Patent") (collectively the "Patents-in-Suit").

Plaintiff originally filed this suit on July 30, 2009. The case was reassigned to this Court on

1 September 18, 2009. The plaintiff filed its second amended complaint on December 17, 2010. (Doc.
2 62). The parties have submitted opposing claim construction briefs, and the Court heard tutorials and
3 oral argument at the *Markman* hearing on October 5, 2011.

2. **Factual Background**

All five of the Patents-in-Suit share the same specification and figures. The Patents-in-Suit claim priority to Provisional Patent Application Number 60/014,242, filed March 26, 1996. The patents protect plaintiff's computer conferencing system, a networking system that allows parties in different places, with different computers or devices, to simultaneously engage in an online conference.[1] *See, e.g.,* '515, 22:58-61. The conference consists of conferees: a presenter (or presenters) and various attendees, who themselves can be active participants in the conference. Their respective computers or devices are known as clients.

The problem that plaintiff's system seeks to resolve occurs when participants in an online conference have varied computer capabilities (for example, different hardware platforms or bandwidths). The title of the '515 patent is illustrative: "Providing Conferencing Data in a Network Communications System Based on Client Capabilities." Put simply, plaintiff's system "reads" the capabilities of the attendee's computer and distributes information in real time from the conference server to the attendee's computer based on those capabilities. The Patents-in-Suit refer to this as "flow control." '515, 8:30. According to the Patents-in-Suit, this system is superior to existing systems, which "lack flexibility and performance if the network connections are unreliable or have narrow bandwidth, or require uniform hardware or software installations." '515, 1:64-68.

The core of the plaintiff's system is the "conference server." While the actual definition of that term is in dispute here, it refers generally to the computer that runs the conferencing software and assesses the capabilities of the attendee's computer.[2] In the claims of the '515 and '304 patents, the

---

[1]This is not the only embodiment of plaintiff's system -- for example, one can watch an archived conference at a later date. However, this is the preferred embodiment of the Patents-in-Suit.

[2]The Court will address the precise definition of "conference server" below. *See Sec. A.*

2

United States District Court
For the Northern District of California

conference server assesses the capabilities of the attendee's computer "after establishing the client-server connection *but prior* to [the] client joining the conference." '515, 36:20-24 (emphasis added). Once that initial connection is made, the attendee computer -- the client -- is assigned a "class":

> The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection.

'515, 21:5-11. A client's class will determine the number of "data blocks" from the conference it will receive. '515, 21:11-65. For example, "Class 2 is used for fast network connections to slow machines . . . A Class 2 client might not be able to process each block, even uncompressed blocks, in which case [the] filter will discard blocks." '515, 21:30-34. By adjusting the type and quantity of data sent and received from attendees, the system (and the conference) maintain flexibility and performance.

The '191 and '331 patents focus on reading the client's capabilities *during* a conference, allowing the system to dynamically change the client's class in real time. An attendee's capabilities may change during a conference (for example, their bandwidth decreases), and the '191/'331 patents address that problem. "Reassignment can occur dynamically as the connection or the client loading change, or when requested by the client." '191:20, 53-57.

Finally, the '489 patent addresses the methods for introducing a client to a conference. The conference server "publishes" the conference listing to assist the attendee in finding the conference. Typically, an attendee connects to the conference server by typing a URL into the attendee's web browser and navigating to a web page. '515, 2:26-28. A conference may require a password or key to attend. '515, 2:33-35. The key can determine the attendee's privileges, ranging from controlling a pointer to becoming a presenter. '515, 2:42-44.

The parties dispute the meaning of seven terms found in the Patents-in-Suit. Plaintiff believes that the definition of three of the terms are case or claim dispositive.

## LEGAL STANDARD

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372

(1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6.

In addition, the claims must be read in view of the specification. *Markman*, 52 F.3d at 978. Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*,

4

52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## DISCUSSION

### 1. Agreed Upon Terms

The parties agree that any terms not otherwise agreed or disagreed upon are subject to the plain and ordinary meaning of the term. Joint Claim Const. at 2 (Doc. 78). The parties agree on the definitions of the following four terms:

- **Web Browser:** "an application executed by a computer to navigate among network resources"
- **[Universal/Uniform] Resource Locator Associated with a Conference**: "an identifier that specifies where the conference is located on a network"
- **Real Time:** plain and ordinary meaning
- **Conference Listing:** "an identifier or address of a particular conference"

5

**2.    Disputed Terms**

The parties disagree about the construction of the terms: **(1) conference server; (2) characteristics of the [provided] conference data; (3) capabilities of the at least one client; (4) client or server information; (5) publishing/published; (6) receiving indicia from a client device; (7) the receipt of/receiving information allowing for conference attendance**. Plaintiff believes that the second through fourth terms -- **characteristics of the [provided] conference data; capabilities of the at least one client;** and **client or server information** -- are case or claim dispositive.

**A.    Conference Server**

The term **conference server** appears in independent claim 1 of the '515, '304, '191, and '331 patents. *See*, *e.g.,* '515, 36:7-13. Plaintiff argues that the term means "a computer or several networked computers running conference software and configured to provide conference data to at least one client." Joint Claim Const. Ex. B at 2. Defendant contends the term means "a computer or several networked computers that provide conference data to a client computer after receiving the client's capabilities." *Id.* '515, 36:7-13.

As the parties agree that the term **conference server** can refer either to a single computer or several networked computers, that portion of the definition is accepted. The first dispute is whether a conference server is defined in part by "provid[ing] conference data to a client computer," as defendant contends. Plaintiff argued at the *Markman* hearing that a conference server does not necessarily provide conference data, because a person may archive the data but never actually retrieve it. Oct. 5, 2011 *Markman* Hearing; *see also* Pl.'s Opening Claim Const. at 8. However, there is nothing in the claims or specification of any of the patents to support such an embodiment. Nor does it make practical sense for the applicants to patent a system that merely archives unused data. The invention's archiving feature is repeatedly described in the specification, but the use or retrieval of that data still requires "providing conference data to a client computer." Defendant's term is accepted.

The second dispute is whether the **conference server** provides data only "after receiving the client's capabilities." Defendant concedes that the '515/'304 patents separately describe this limitation in their respective independent claims. Def.'s Claim Const. at 8. However, defendant seeks to import

6

it into the definition of **conference server** in order to limit the reach of the '191/'331 patents. *Id.* In defendant's view, although the '191/'331 patents describe the re-assignment of output filter classes *during* the conference, such activity can only occur after the conference server initially receives the client's capabilities *prior* to the conference and assigns it an initial class. *Id.*

While defendant is correct that re-assignment can only occur after assignment, it provides no convincing argument that the *definition* of **conference server** requires the limitation. Indeed, the defendant's limitation would be superfluous with respect to the '515/'304 patents and unduly restrictive with respect to the '489 patent. As defendant concedes, the '515/'304 patents already contain language defining *when* the client's capacities are received; the patents claim a conference server "wherein . . . one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client validated *after establishing* the client-server connection but prior to the at least one client the conference." '515, 36:24-32. (emphasis added). It would therefore be unnecessary to include defendant's temporal limitation in the definition of **conference server** itself. Furthermore, the '489 patent does not require reading the client's capabilities at all. It simply addresses the introduction of a client to a conference. Therefore, when '489 describes "connecting the conference server and the client device" in independent claim 1, it then cannot require doing so only "after receiving the client's capabilities." This portion of defendant's definition is rejected.

> **Conference Server** is defined as "a computer or several networked computers running conference software and providing conference data to a client computer."

### B.  Characteristics of [the Provided] Conferencing Data

The terms "**characteristics of the provided conferencing data**" and "**characteristics of the conferencing data**" appear in independent claims 1 and 17 of the '515/'304 patents, and independent claims 1 and 39 of the '191/'331 patents. *See, e.g.,* '515, 36:8-23. Plaintiff contends that this phrase means "qualities, properties, or attributes inherent in or ascribed to [the provided] conferencing data." Joint Claim Const. Ex. B at 3. Defendant seeks to limit that definition by removing the language of "inherent in or ascribed to" and appending a defining parenthetical; to defendant, the phrases mean

7

"qualities, properties, or attributes of the provided conferencing data (i.e., size, content, rate of transmission and reception)." *Id.*

Plaintiff concedes that the phrase "**characteristics of [the provided] conferencing data**" does not appear outside of the claims. It instead points to the phrase's use during the prosecution history. During the prosecution of the '515 Patent, the applicants stated the following:

> "[We] have amended the claims of the present application such that all recitations to *aspects* now refer to *characteristics*. A characteristic is generally recognized as a quality, property, or attribute inherent or ascribed to someone or something. In the case of claim 23, for example, 'characteristics of the provided conference data' are recited. Characteristics of conferencing data are inherent and may include -- but are not limited to -- size, content, rate of transmission and reception, and so forth."

Opening Claim Const. Ex. A at 13 ('515 Patent Prosecution History, April 27, 2006)). Plaintiff emphasizes the use of the phrases "may include," "but are not limited to," and "and so forth." *Id.* at 10. According to the plaintiff, the four characteristics to which the defendants seek to restrict the terms -- size, content, rate of transmission and reception -- are only examples of characteristics; the applicants "did not intend this term to be limited to those examples." *Id.* at 10.

Defendants rely on *ICU Medical, Inc. v. Alaris Medical System, Inc.,* 558 F.3d 1368 (Fed. Cir. 2009) to argue that **characteristics of conferencing data** should be limited to the four characteristics named in the prosecution history. Def's Claim Response at 12. In *ICU Medical*, the Federal Circuit upheld the district court's conclusion limiting the term "spike" to "having a pointed tip for piercing the seal," over plaintiff's construction that a spike was simply "an upward projection." 558 F.3d at 1374. While recognizing that "it is true we should not import limitations from the specification into the claims," the court upheld the limitation because the specification "*repeatedly and uniformly* describe[d] the spike as a pointed instrument for the purpose of piercing a seal inside the valve." *Id.* (emphasis added). The defendant argues the same logic applies here because the prosecution histories of the '515 and '191 patents both contain the language cited above -- repeatedly describing characteristics of the conference data as "size, content, rate of transmission and reception." Def.'s Claim Response at 12.

The Court disagrees. Neither the context, the specification, nor the dependent claims support defendant's construction. First, the defendant removes the four examples from their context -- that characteristics "may include -- but are not limited to -- size, content, rate of transmission and reception,

8

and so forth." Opening Claim Const. Ex. A at 13. Claim terms are given their ordinary and accustomed meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor *intended otherwise*. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). Here, the ordinary meaning of "characteristics of conferencing data" does not require the defendant's limitations, nor does the prosecution history demonstrate that the inventor intended to impose such limitations. In fact, the inventor's inclusion of the phrase "but not limited to" makes clear that the opposite is true. Unlike in *ICU Medical*, the phrase is not "repeatedly and uniformly" limited by the terms defendants seek to impose. Instead, in the one place the term appears outside of the claims (in the prosecution history), it is explicitly left open as not limited to the exemplary terms.

Moreover, the specification provides examples of other characteristics not included in the defendant's definition. For example, the specification states that in some embodiments, the "conference server matches the form of the image to the attendee clients before sending it." '515, 9:38-40. "Form of the image" is a characteristic of conferencing data not encompassed by the limitations defendant seeks to impose.

Finally, the dependent claims in the Patents-in-Suit provide other examples of possible "characteristics." Dependent claim 6 of the '515 patent, for example, claims "the conferencing system of claim 1, wherein one characteristic of the provided conferencing data comprises at least one destination of at least part of the conferencing data"; dependent claim 12 describes, "one characteristic of the provided conferencing data comprises at least one modification to a conference environment originated by the server." '515, 36:35-37, 60-63. While it is true, as defendant points out, that plaintiff has not asserted the dependent claims in this lawsuit, the court should "not interpret an independent claim in a way that is inconsistent with a claim that depends from it." *Wright Medical Tech. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997). It would be inconsistent with the dependent claims to limit the definition of characteristics to the four proposed by defendants. The Court does agree with defendant that many of the dependent claims are vague and indefinite (such as "at least some information" cited in dependent claim 4); however, there are sufficient dependent claims citing

characteristics that have substance, such as those in dependent claims 6 and 12, that it would be inconsistent to define "characteristics" so narrowly.

Plaintiff did concede at the *Markman* hearing that the use of examples the applicants provided in the prosecution history can clarify for a jury the types of things that are covered by a particular term. The Court will therefore include the applicant's examples as part of the definition.

> **Characteristics of [the Provided] Conferencing Data** means "qualities, properties, or attributes inherent in or ascribed to [the provided] conferencing data, including size, content, rate of transmission and reception."

### C. Capabilities of the At Least One Client

The term "**capabilities of the at least one client**" appears in independent claims 1 and 17 of the '515/'304 patents. Plaintiff asserts that the phrase means "client parameters relating to resources available to the client." Defendant contends the phrase means "the client's display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to each client confirmed by the conference server after the client connects to the conferencing server."

As with the preceding term, defendant seeks to limit **capabilities of the at least one client** to the respective examples listed with that phrase in the specification. The defendant notes that the applicants and '515 and '191 patents, when discussing capabilities, repeatedly cite to display bit-depth, bandwidth of the connection between the client and conference server, processor speed of the client and the amount of memory available to each client. *See* '515, 3:26-29; Def. Ex. 5 ('515 Patent file history, April 24, 2006, Response to Office Action "Amendment" A at page 15); Def. Ex. 1 ('191 Patent file history, May 22, 2006, Response to Office Action titled "Amendment A" at 16). Therefore, the defendant again argues, the Court should apply *ICU Medical* and define the term by its limited scope. Defs.' Claim Response at 17.

The Court's analysis here is substantially similar to that in Section B. Terms are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The ordinary and customary meaning of the phrase **capabilities of the at least one client** does

1 not suggest defendant's limitations.  Moreover, the claims must be read in view of the specification.
2 *Markman*, 52 F.3d at 978.  Here, the specification provides that "[t]he server accepts system information
3 from each client connection and notes the client's requirements (e.g., all images must be 256-color
4 images) and *capabilities* (e.g., CPU speed, available hardware-assist for graphics, compression, DSP,
5 Windows DDB available)." '515, Patent, 18:58-62 (emphasis added.)  Available hardware assist for
6 graphics, compression, DSP, and Windows DDB available are not accounted for in defendant's
7 construction of **capabilities**.  Again, *ICU Medical* is inapplicable as the term is not "repeatedly and
8 uniformly" defined by defendant's limitations.

9 However, as above, the included examples may help clarify the term for a jury. The Court will
10 therefore provide examples as part of the definition.

> **Capabilities of the At Least One Client** means "client parameters relating to resources available to the client, including the client's display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to the client."

### D. Client or Server Information

The term "**client or server information**" appears in independent claims 1 and 39 of the '191/'331 patents.  Plaintiff seeks to define the term according to the plain and ordinary meaning of its constituent terms.  Defendant contends the term means "client or server system parameters (i.e., display bit-depth, bandwidth of the connection between client and conference server, processor speed of the client, and the amount of memory available to each client) that result from querying the client or server."

As an initial matter, the Court agrees with defendant that it would be unhelpful to simply accept the "plain and ordinary meaning" of the term, as plaintiff desires.  As the Federal Circuit noted in *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* "a determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary meaning' does not resolve the parties' dispute."  521 F.3d 1351, 1361 (Fed. Cir. 2008).  The parties here clearly dispute the meaning of the term, and thus the Court will turn to the evidence to define it.

11

1       However, the Court does not agree with defendant's construction of the term. The defendant
2  here argues that the definition of **client or server information**, like **capabilities of at least one client**,
3  is limited to display bit-depth, bandwidth of the connection between client and conference server,
4  processor speed of the client, and the amount of memory available to each client. Defendant seeks to
5  import that definition into the term **client or server information** because, it claims, for the purposes
6  of the patents in suit, " information and capabilities *are the same thing*." Def's Claim Const. Response
7  at 20 (emphasis in original). However, the Court has already rejected defendant's limited construction
8  of the term **capabilities**. *See Sec. B*. Moreover, the specification makes clear that **information** is a
9  broader term than **capabilities**; for example, "the server accepts system information from each client
10 connection and notes the client's requirements (e.g., all images must be 256-color images) *and*
11 capabilities . . ." '191, 18:39-41. **Information** includes both requirements *and* capabilities, and thus
12 cannot be as narrowly defined as capabilities alone.

13      Instead, there are numerous areas of the specifications that describe and contextualize **client or**
14 **server information**. The Court has already noted that "information" includes requirements and
15 capabilities. Information may also include demands made by a client: "These [data] blocks are not sent
16 until [image] scrolling requires them or they are otherwise demanded by the attendee." '191, 16:35-38.
17 Information can also include requests by a client: "The network connections can be maintained during
18 the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-
19 air, and no changes will be sent or scheduled by the server during the off-air time." '191, 15:29-35.
20 Information may also include characteristics: "These services can be provided automatically depending
21 on resources of the computers and network . . . and facilities available (for example, announced client
22 characteristics, such as CPU speed, compression and/or decompression hardware, or display
23 parameters)." '191, 4:46-52. Finally, information may also include configurations: "If clients are so
24 configured, conferees can be given lists or iconic representations of the participants in the conference."
25 '191, 13:36-38.

26      Therefore, **client or server information** consists of capabilities, requirements, demands and
27 requests, or the configurations and characteristics of the client or server. This definition comports with
28 an "ordinary and customary meaning" of the term, as well as the specification. *See Phillips*, 415 F.3d

12

at 1312. As with **characteristics** and **capabilities** above, examples in the definition may provide clarity to the jury. Both parties' constructions contain the four examples listed by defendant, though in plaintiff's version, they are simply examples. The Court will provide the examples in the definition.

Defendants also seek to import into the definition of **client or server information** language that the parameters are "determined or examined by querying the client or server." Def's Claim Resp. at 17. Plaintiff agrees that client or server information "*may* be determined or examined by querying the client or server." Pl.'s Opening Claim Const. at 18. Plaintiff argues, however, that there are other methods to examine such information without querying the client or server. In support, it cites two examples from portions of the specification discussing multiple server configurations -- information may "be provided in the data stream" or may be "announced or demanded by clients." Pl.'s Reply at 13 (*citing* '191, 4:36-38; '191, 29:11-17). The Court agrees, and therefore rejects this portion of defendant's definition.

> **Client or Server Information** means "the capabilities, requirements, demands and requests, or configurations and characteristics of the client or server. Information may include any data, facts, and measurements, or the display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to each client."

### E.     Publishing/Published

The term "**publishing**" appears in independent claim 1 of the '489 patent, and the term "**published**" appears in dependent claim 4 of the '489 patent. While the term was initially disputed, defendant agreed to plaintiff's construction at the *Markman* hearing.

> **Publishing/Published** means "making/made known, findable, or locatable"

### F.     Receiving Indicia From a Client Device

The term "**receiving indicia from a client device**" appears in independent claim 1 of the '489 patent. Plaintiff contends the term means "receiving a sign from a client device." Defendant argues the term means "receiving a communication from a client device."

13

Defendant seeks to limit the definition of "indicia" to "communication." In support, it cites the specification: "Potential new conferee client 17(a) sends a request to join the meeting . . ." '489, 30:22-23. Defendant then equates "sending a request" with a "communication." Def.'s Claim Resp. at 24. However, as plaintiff demonstrates, this is but one method of connecting to a conference. "The connection can also be accomplished in different ways, such using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings." '515, 9:4-8. As noted above, a claim is not limited to the preferred embodiment of the invention. *See Texas Instruments,* 805 F.2d at 1563 (Fed.Cir.1986).

The plaintiff equates "indicia" with "sign." Pl.'s Opening Claim Const. at 20. In support, it provides a definition from Webster's New Encyclopedic Dictionary, noting indicia is derived from the plural of the Latin *indicium*, meaning "sign." Pl.'s Opening Claim Const. Ex. H. While the *Phillips* court reduced the prominence of dictionaries in claim construction, *see* 415 F.3d at 1322-23, it agreed that they can be appropriate where "the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." That is the case here. Each of the embodiments in which a client may connect to or join a conference involve the conference server receiving a form of "sign" from the client. The Court accepts the definition.

> **Receiving Indicia from a Client Device** means "receiving a sign from a client device"

### G.     The Receipt Of/Receiving Information Allowing for Conference Attendance

The term "**receiving information allowing for conference attendance**" appears in independent claim 1 of the '489 Patent, and "**the receipt of information allowing for conference attendance**" appears in dependent claim 5 of the '489 patent. Plaintiff argues the term should be construed according to the plain and ordinary meaning of the constituent words. Pl.'s Opening Claim Const. at 21. Defendant construes the term to mean "receiving a key from the client computer to validate the client computer." Def.'s Claim Resp. at 24. In its response, defendant also agrees to a modified construction of: "receiving a key or other previously selected identification information . . ." *Id.*

14

Plaintiff argues that the defendant's construction is unduly restrictive because it requires "receiving a key" to validate the computer. Plaintiff points out that the receipt of a key is optional. The specification explicitly states that "at the time of setup, one or more password character strings ('keys') *can* be specified for the conference." '489, 2:30-32; *see also* '489, FIG. 2 ("Conferee points browser to conference URL, provides keyword *if needed*") (emphasis added.) The Court agrees -- the definition cannot require a key.

In its motion papers, defendant augmented its definition by providing the modified construction, "receiving a key or other previously selected identification information." Def.'s Claim Resp. at 24. In support, it cites the specification statement that "Potential client 17(a) may also send previously selected identification information such as icon, gong, etc." '489, 30:29-35. However, the "icon, gong, etc." refers to personal markers a client can use *after* joining a conference to identify itself, not as tools to access the conference.

Because defendant's construction of the term here is not viable, it is appropriate to accept plaintiff's proposal to use the plain and ordinary meaning of the constituent words. "Receiving information allowing for conference attendance" is not a term of art, and the plain and ordinary meaning is easily accessible. The Court will, however, provide the example of a "key" to clarify for the jury the types of information meant by the phrase.

> **The Receipt of/Receiving Information Allowing for Conference Attendance:** This term should be construed according to the plain and ordinary meaning of its constituent words. One example of information allowing for conference attendance is a key.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court adopts the constructions set out above.

**IT IS SO ORDERED.**

Dated: November 1, 20111

SUSAN ILLSTON
United States District Judge