1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PIXION, INC.,

              Plaintiff,

  v.

CITRIX SYSTEMS, INC., and CITRIX
ONLINE, LLC.

              Defendants.

_____/

No. C 09-03496 SI

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

On June 15, 2012, defendant Citrix Systems, Inc. ("Citrix") filed a motion for summary judgment of non-infringement and invalidity in this patent dispute. Plaintiff Pixion, Inc. opposed on June 26, 2012, and Citrix replied on July 6, 2012. The Court held a hearing on the motion on July 13, 2012. Having considered the arguments of counsel and the papers submitted, and for good cause shown, the Court GRANTS the motion.

**BACKGROUND**

Plaintiff Pixion, Inc. ("Pixion") is a corporation formed in 1995 that focuses on developing "cost-effective interactive online meeting environments such as web conferencing solutions." Second Am. Compl. (Doc. 62) at 2. Plaintiff alleges that defendants Citrix Systems, Inc. and Citrix Online, LLC (collectively "Citrix") "makes, uses, offers to sell, and sells in the United States and imports into the United States online conferencing and collaboration systems" that infringe various patents belonging to Pixion. *Id.* at 5. Specifically, plaintiffs allege infringement of four related patents: U.S. Patent Nos. 7,369,515 ("'515 Patent"), 7,426,191 ("'191 Patent"), 7,715,331 ("'331 Patent"), and 7,813,304 ("'304

**United States District Court**
For the Northern District of California

Patent") (collectively the "conference system patents"); and a fifth patent pertaining to introducing a client to a conference, U.S. Patent No. 7,877,489 ( "'489 Patent").[1]   Citrix brings this motion for summary judgment on non-infringement of the four conference system patents only, as well as invalidity of the asserted claims of all five patents (collectively the "patents-in-suit").[2]   The Court issued a Claim Construction Order in this case on November 1, 2011.  *See* Doc. 91.  On March 8, 2012, the Court granted Pixion's motion for judgment on one of Citrix's counterclaims, finding that Pixion did not engage in inequitable conduct by failing to disclose certain office actions to the PTO during the concurrent prosecution of its patents.  *See* Doc. 113.  On April 16, 2012, the Court denied Citrix's motion for leave to amend its counterclaim with additional allegations that Pixion engaged in inequitable conduct by failing to disclose certain prior art.  *See* Doc. 132.

###   A.   Conference System Patents

The '515, '191, '331, and '304 patents share the same written description, figures, and title: "Providing Conference Data In A Network Communications System Based On Client Or Server Information Examined During A Conference."  The patents aim to solve the problem of connecting computers with different network speeds and different hardware capabilities to a shared web conference. In the words of the patentee, "[v]aried techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess." '191, Abstract.  The invention "transports at varying speeds those streams where intermediate updates can be dropped if they are obsoleted by later arriving data updates, optimizing the utilization of network and node resources."  *Id.*

The '515 and '191 patents were issued in 2008, and are the respective parents of the '304 and '331 patents, which  issued in 2010. The conference system patents claim priority to Provisional Patent Application 60/014,242, filed March 26, 1996.  The '515/'304 and '191/'331 patents (the parent/child

---

[1] Infringement of the '489 Patent was originally alleged in a separate complaint (Case No. CV 11-00694 EMC); that action was later consolidated with the present case.

[2] Pixion asserts claims 1 and 17 in the '304 and '515 Patents, claims 1 and 39 in the '331 and '191 Patents, and claims 1, 4, and 5 in the '489 Patent (the "asserted claims").

1  patents have nearly identical claims) differ only as to when the conference server gathers the client

2  information: in the '515/'304 patents, the capabilities of each attendee are collected <u>before</u> the client

3  joins the conference (i.e. before the server sends conference data), whereas in the '191/'331 patents, the

4  conference server gathers client capabilities <u>during</u> the conference. The central issue in the infringement

5  dispute is how the conference data is provided, and whether the characteristics of the provided data are

6  based on the capabilities of a client. Each of the conference system patents contains two independent

7  claims, a system claim and a method claim. The '515/'304 patents claim the following (emphasis

8  showing critical terms):

9      **1.** A conferencing system comprising:
   a conference server;

10  at least one client the at least one client including a web browser; and
    at least one network connection coupling the conference server and the at least one client, the

11  conference server providing conferencing data to the at least one client via the at least one
    network connection after the client-server connection is established, the client-server

12  connection established via the web browser at the at least one client having been navigated
    to a Universal Resource Locator associated with a conference, and **wherein one or more**

13  **characteristics of the provided conferencing data are based on current capabilities of
    the at least one client validated after establishing the client-server connection but prior**

14  **to** the at least one client joining the conference.

15

16      **17.** A method for conferencing between a server and at least one client in a conferencing
    system, the method comprising:

17  establishing a network connection between the server and the at least one client, the network
    connection established via a web browser at the at least one client having been navigated to

18  a Universal Resource Locator associated with a conference;
    determining one or more characteristics of conferencing data for delivery during the conference, the

19  **determination based on current capabilities of the at least one client** validated after
    establishing the client-server connection but prior to the at least one client joining the

20  conference; and
    providing the conferencing data from the server to the at least one client after establishing the

21  network connection between the server and the at least one client and validating the current
    capabilities of the at least one client, the **provided conference data based on the current**

22  **capabilities** of the at least one client.

                                      '515, 36:7-24, 37:14-32.

23      The '191/'331 patents contain a similar Claim 1 with the limitation: "wherein one or more

24  characteristics of the provided conferencing data are **based on client or server information examined**

25  **subsequent to** both the client-server connection having been established and the client joining the

26  conference." '191 Patent; 35: 24-39. The method in '191/'331 patents is contained in Claim 39:

27

28      **39.** A method for conferencing between a server and at least one client in a conferencing
    system, comprising:

establishing a network connection between the server and the at least one client, the network
    connection established via a web browser at the at least one client having been navigated to
    a Universal Resource Locator associated with a conference;
**examining client or server information** subsequent to both the client-server connection having
    been established and the client joining the conference; and
providing conferencing data from the server to the at least one client alter establishing a
    client-server connection and the at least one client having joined the conference, **wherein
    one or more characteristics of the conferencing data are based on the examined client
    or server information**.

'191, 37:33-38:14.

The specification describes one embodiment of the invention as follows:

> The attendee clients are classified into one of three classes: Class 1 clients are fast clients
> on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are
> clients on slow networks and/or slow clients which cannot process and/or receive the data
> required of Class 2 clients. Each attendee client is assigned to a class, on the basis of
> announced or measured characteristics of the client and its network connection.

'515, 21:5-11.

In this embodiment, a client's class will determine the number of "data blocks" from the conference it
will receive. '515, 21:11-65.  For example, "Class 2 is used for fast network connections to slow
machines. . . A Class 2 client might not be able to process each block, even uncompressed blocks, in
which case [the] filter will discard blocks." '515, 21:30-34.  By adjusting the type and quantity of data
sent and received from attendees, the system (and the conference) can maintain flexibility and
performance.

The Court has construed the following terms relevant to the instant motion:

• **capabilities of the at least one client**: "client parameters relating to resources available to the
client, including the client's display bit-depth, bandwidth of the connection between the client and
the conference server, processor speed of the client, and the amount of memory available to the
client."

• **client or server information**: "the capabilities, requirements, demands and requests, or
configurations and characteristics of the client or server. Information may include any data, facts,
and measurements, or the display bit-depth, bandwidth of the connection between the client and the
conference server, processor speed of the client, and the amount of memory available to each client."

• **characteristics of [the provided] conferencing data**: "qualities, properties, or attributes inherent
in or ascribed to [the provided] conferencing data, including size, content, rate of transmission and
reception."

• **a conference server**: "a computer or several networked computers running conference software
and providing conference data to a client computer"

The parties have also agreed on the following terms:

• **Web Browser:** "an application executed by a computer to navigate among network resources."

United States District Court
For the Northern District of California

• **[Universal/Uniform] Resource Locator (URL) Associated with a Conference**: "an identifier that specifies where the conference is located on a network."

• **Conference Listing:** "an identifier or address of a particular conference."

### B.     '489 Patent

The '489 patent is named "Negotiation And Validation Of A Client In A Video Conference" and it contains a single independent claim with four dependent claims, of which Claims 1, 4 and 5 are asserted:

> **1.** A method for introducing a client to a conference, the method comprising:
> **publishing a conference listing** corresponding to the conference, wherein the conference listing is located by a client device seeking to enter into the corresponding conference;
> **receiving indicia from a client device** indicating that a **web browser** corresponding to the client device has been pointed to the conference listing;
> **receiving information allowing for conference attendance** by the client device;
> connecting the conference server and the client device; and
> allowing for entrance of the client into the conference.
>
> **4.** The method of claim 1, wherein the conference listing is published for subsequent location using a uniform resource locator (URL).
>
> **5.** The method of claim 1, wherein the receipt of information allowing for conference attendance occurs after a validation operation.

'489, 35:17-36:7, 16-21.

The '489 patent has the same abstract and specification as the four conference system patents. Typically, an attendee connects to the conference server by typing a URL into the attendee's web browser and navigating to a web page. '489, 2:26-28. The parties agreed that "publishing/published" means "making/made known, findable, or locatable." "Receiving indicia from a client device" was construed as "receiving a sign from a client device." Finally, "receiving information allowing for conference attendance" was defined according to its plain and ordinary meaning, including a contemplated embodiment that a conference may require a password or key to attend. '489, 2:33-35. The key can determine the attendee's privileges, ranging from controlling a pointer to becoming a presenter. '489, 2:42-44.

### C.   The Accused Products

The accused products are Citrix's GoToMeeting and GoToWebinar software packages, which allow a user who is a conference "presenter" to share his computer screen, including all windows open on the desktop, with other users who are the conference "participants." This is called "screen sharing." Noninfringement Expert Report of Kevin Jeffay, Ph.D. (Ex. 10 to Martinson Decl. in Support of Citrix's Motion for Summary Judgment, "Jeffay Non-infringement Rep.") ¶ 25.  The accused products utilize proprietary software technology developed by Citrix named SetSync and Atomic Push.  In capturing the presenter's screen, the application represents each snapshot of the desktop (called an "epoch") as a set of data packets, where each data packet contains a portion of the screen's image.  At each point in time, "the application determines what areas of the screen changed since the previous snapshot, and, for those areas that have changed, new data packets are created." *Id.* ¶ 3.  Data packets are organized by a unique identifier number, and then "pushed" by Atomic Push into the SetSync layer in the Citrix application. *Id.* ¶ 33.  On the presenter's computer, the data is then "pulled" out of SetSync by a communications layer, which establishes a connection to the server.  The communications layer uses a "TCP [Transmission Control Protocol] socket" that is part of the underlying operating system on the presenter's computer. *Id.* ¶ 34.  A TCP socket is a standard operating system component that maintains a connection with the network.  When the connection with a participant is ready to accept data, "the transmission communications layer on the server pulls an epoch out of SetSync and atomically pushes that epoch to the participant over the socket." *Id.* ¶ 39. Citrix notes that it is the underlying connection, rather than the Citrix application, that determines when data is pulled from Set Sync and transmitted to the server. *Id.* ¶ 34.

Pixion alleges that Citrix's accused products infringe the asserted claims of Pixion's patents, claiming a conferencing system and a method of introducing a client to the conference.  Citrix argues that its products do not infringe the patents in suit, and that the asserted claims are invalid due to anticipation by an earlier conferencing system, known as "CU-SeeMe."

### LEGAL STANDARD

Summary adjudication is proper when "the movant shows that there is no genuine dispute as to

6

any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact,  the  burden of production then shifts so that the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *Id.* at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. See Fed.R.Civ.P. 56(c)(4). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

Summary judgment is improper when the record contains "evidence on which the jury could reasonably find for the non-moving party." *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  With respect to infringement, a mere disagreement between experts is not sufficient to raise a triable issue of fact; rather, an expert's opinion must present "sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant." *Rambus Inc. v. Hynix Semiconductor Inc.*, 628 F. Supp. 2d 1114, 1122 (N.D. Cal. 2008) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046–48 (Fed. Cir. 2000)).  With respect to invalidity, the presumption of a patent's validity must be overcome by clear and convincing evidence.  *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir.2003).

**DISCUSSION**

**A.     Non-Infringement**

To find infringement, "the court must determine that every claim limitation is found in the accused device." *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (internal citations omitted). Summary judgment of non-infringement is a two-step analysis. First, the claims of the patent must be construed to determine their scope, as a question of law. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). Second, "a determination must be made as to whether the properly construed claims read on the accused device." *Id.* The determination of infringement is generally a question of fact. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Since the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

Citrix argues that Pixion and its expert, Dr. Stevenson, have not shown that each and every limitation of each of the asserted claims is present in the accused products, and therefore Pixion has not established a genuine issue of material fact. *See id.* For each claim, Citrix points out which limitations have not been identified by Pixion, and argues that with the burden shifting onto the plaintiff, Pixion has not met its burden of production. *See supra T.W. Elec. Service*, 809 F.2d at 630. Citrix also argues that the accused products affirmatively do not infringe the patents-in-suit because they do not provide conference data based on either "client capabilities" or "client information," and do not validate client information before or during the conference.

**1.     The '515 and '304 Patents**

The '515/'304 patents contain the limitation: "wherein one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client <u>validated after</u> establishing the client-server connection <u>but prior to</u> the at least one client joining the conference." '515, 36:7-24. In other words, the patents are concerned with validating client capabilities that affect

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   conference data before joining the conference.[3]  Citrix argues that Pixion's expert, Dr. Stevenson, was

2   unable to show how the accused products meet this limitation, and that the products do not validate any

3   client capabilities before sending conference data.  Citrix's Reply in Support of its Motion for Summary

4   Judgment (Doc. 169, "Def.'s Reply") at 3.  During the deposition, when asked "Where in your report

5   do you set forth your analysis that the current capabilities of the at least one client are validated after

6   the establishment of client-server connection but prior to the client joining the conference?"  Dr.

7   Stevenson responded with "I don't address it."  Dep. Stevenson (Springer Decl. Ex. 7, Doc. 161) at 90:10

8   - 92:1. Pixion contends that Dr. Stevenson addressed this limitation when he stated "this is one of those

9   [situations] that is abundantly clear. . . [t]he process of adjusting for the client-server connection has

10  been going on for a while, and . . . before they joined the conference."  Pixion's Opposition to Citrix's

11  Motion for Summary Judgment (Doc. 159, "Pl.'s Opp.") at 16, citing Dep. Stevenson, 91:13-20.  Citrix

12  argues this statement is an unsupported conclusion and is therefore insufficient to meet Pixion's burden

13  of production.  Def.'s Reply at 3.

14        The Federal Circuit has held that "[i]t is well settled that an expert's unsupported conclusion on

15  the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party

16  may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical

17  claim limitation is found in the accused device."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363

18  F.3d 1263, 1277-78 (Fed. Cir. 2004) (citing *Arthur A. Collins*, 216 F.3d at 1046).  The Circuit upheld

19  a summary judgment of non-infringement when an expert's statement "[did] not pinpoint where those

20  elements are found in the accused devices,"  holding that "opaque identification is not enough to permit

21  any reasonable juror to make that leap."  *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589

22  F.3d 1179, 1184 (Fed. Cir. 2009).  The Circuit further held that an expert "needed to supply at a

23  minimum some description about the specific features" that show infringement of the asserted claims.

24  *Id.*

25        Pixion has provided no materials in the record regarding the steps that take place prior to a client

26

27

---

28        [3] Neither party offers a position on what constitutes "validating."

9

joining a conference in the accused products.  Nor has Pixion addressed the "validating" limitation.[4]

Pixion does not identify any features of the software that validate any aspect of the user's capabilities.

The statement made by Dr. Stevenson is therefore an unsupported conclusion.  Citrix's expert report,

describing the functionality of the accused products and opining that they do not infringe the patents in

suit, therefore stands uncontradicted.  *See TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1375 (Fed.

Cir. 2002) (finding plaintiff "failed to provide evidence to explain how" accused products infringed,

leaving defendant's evidence uncontradicted).  The Court finds that Citrix has shown that evidence on

record "fails to establish a material issue of fact essential to the patentee's case" with respect to the

infringement of the '515/'304 patents."  *See Novartis Corp.*, 271 F.3d at 1046.

### 2.    The '191 and '331 Patents

Citrix asserts that Pixion cannot prove infringement of '191/331 patents because the claims

require that "one or more characteristics of the provided conferencing data are <u>based on</u> client or server

information <u>examined</u> subsequent to both the client-server connection having been established and the

client joining the conference." '191 Patent; 35: 24-39, see Def.'s Reply at 4.  Citrix argues that Pixion

has again failed to support its case for infringement with sufficient factual support, and that SetSync and

Atomic Push do not provide data " based on client or server information" that is "examined".  *Id.* at 7.[5]

Pixion counters that "[b]y not sending *all* data, SetSync adapts the communication traffic to the

available network bandwidth." Pl.'s Opp. at 11-12 (emphasis in the original).  Pixion quotes its expert's

report:

> Both the presenter computer and the multicast communication server will modify
> characteristics of the conferencing data (i.e., the screen-sharing data) by selectively not
> sending epochs and data packets (i.e., not sending through all the screen-sharing data). The
> decision of which conferencing data that is not to be sent is based on the capabilities of the
> network link between computers. The capabilities of the network connection represents
> information about both the client and the server.  Stevenson Rep. (Springer Decl. Ex. 7)  ¶¶

---

[4] Nor would such an argument be consistent with Pixion's allegations of how Citrix's products infringe, as discussed below. Pixion argues that by skipping epochs or data packets *during* the conference, conference data is changed, thus evincing bandwidth adaptability and infringing its products.  Pixion makes no allegations that before any skipping (which by definition occurs during the conference) has occurred, SetSync validates capabilities of the attendee.

[5] Neither party offers a position on what constitutes "examined."

United States District Court

For the Northern District of California

52-53.

Dr. Stevenson further testified that "by skipping epochs, conference data would be changed" and "the availability of the underlying network connection is used in [a] way to modify the characteristics of the provided conferencing data" in that "it changes things like the size, and the content, and the bit rate of . . . the conference data."  Pl.'s Opp. at 14-15.

Pixion provides lengthy string citations to the testimony of Citrix's expert and chief scientist. However, Pixion's assertions do not identify what specific client information is being used by the accused products, in what way that information is "examined," or how it forms the basis for modifying characteristics of the conferencing data, as the claim requires.  The Federal Circuit has long held that "a party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device." *Arthur A. Collins*, 216 F.3d at 1048.  The statements provided by Pixion and Dr. Stevenson do not muster sufficient factual foundation to rise above "little other than a conclusory opinion" that the application practices the limitations found in the patent claims.  *Dynacore Holdings*, 363 F.3d at 1278; *see also TechSearch*, 286 F.3d at 1375.

Neither Pixion nor Dr. Stevenson addresses how the accused products engage in "selectively not sending" data packets, or the specific structure or function of the application that makes the "decision" not to send packets that is tied to specific client information. The expert report provided by Dr. Stevenson devotes several pages to repeating the description of the accused products provided by Citrix's expert, Dr. Jeffay, and Citrix's chief scientist, Dr. Alexandrov.  The statements made by Dr. Stevenson himself, however, provide little additional information or analysis of the alleged infringing functions beyond vague and conclusory allegations.  *See* Stevenson Rep. ¶ 40 ("While there are many layers that control the exact form of the communication, the SetSync layer controls the characteristics of the conferencing data that is provided based on information about the client and server."); ¶ 53 ("The decision of which conferencing data that is not to be sent is based on the capabilities of the network link between the computers."); ¶ 57 ("[I]t was visibly clear that GoToMeeting modified the conference data that was provided.").  Citrix's expert fails to demonstrate precisely how Citrix's technology meets the claim limitations.

The most glaring absence from Dr. Stevensons' report is any description of an element of

11

United States District Court
For the Northern District of California

1  Citrix's technology that describes  basing the provided data on "client or server information examined"

2  during the conference.  He nowhere describes any act of examination, nor what aspect of Citrix's

3  software does the examining.

4  As discussed with respect to the '515 and '304 patents above, Pixion does not "supply at a

5  minimum some description about the specific features" needed to support its allegations of infringement.

6  *Intellectual Sci. & Tech.*, 589 F.3d at 1186.  Without adequate factual basis, these conclusory opinions

7  fail to move beyond "opaque identification" that is insufficient to raise a material question of fact.  *Id.*

8  Therefore, Citrix's evidence stands uncontradicted.  Drs. Jeffay and Alexandrov testified that the

9  application does not examine client information, but rather sends data packets that constitute each epoch

10  as the connection between the presenter and the network becomes available.  Def.'s Reply at 5, *citing*

11  Alexandrov Dep. at 214:24-215:14; 274:20-275:19; Jeffay Dep. at 399:11-25; 400:12-14; 401:9-11;

12  440:16-20.  Accordingly, the Court finds that Citrix has shown that the evidence on the record fails to

13  establish a material issue of fact essential to the patentee's case with respect to the infringement of the

14  '191/'331 patents.

15  Citrix's motion for summary judgment of non-infringement is GRANTED.

16

17  **B.      Invalidity**

18  Citrix separately moves for summary judgment on the grounds that the asserted claims in the

19  patents-in-suit are invalid.  Citrix argues that "CU-SeeMe," a conferencing system developed at Cornell

20  University with funding from the National Science Foundation, anticipated these claims.

21

22  **1.      CU-SeeMe Overview**

23  CU-SeeMe was an early videoconferencing system that allowed participants to "meet" with one

24  another over the internet.  Participants could view one another via cameras attached to their respective

25  computers.  Funding to develop the program was provided in part by a grant from the National Science

26  Foundation.  Martinson Decl., Ex. 16  (Letter Enclosing 1993 NSF Grant).  It supported point-to-point

27  connections (i.e., client to client) as well as multi-party conferences using an application known as a

28  "reflector."  The software was developed at Cornell University primarily by Richard Cogger and Tim

United States District Court
For the Northern District of California

Dorcey.  Def.'s MSJ at 13.  By 1993, the software was freely available to anybody who wanted to download it.  Cogger Dep., 34:12-35:13.  According to Mr. Cogger, many people downloaded the program from Cornell's File Transfer Protocol ("FTP") site.  *Id.* 67:20-68:4.  The program, using today's parlance, "had gone viral."  *Id.*, 71:11-12.  CU-SeeMe was distributed along with associated documents known as "ReadMe" files, which were commonly provided along with downloaded software in the early days of the internet.  Martinson Decl., Ex. 8A (Jeffay Dep. 164:16-25).  "ReadMe" files would explain what was in the distributed files.  *Id.*[6]  Mr. Cogger authored many of the ReadMe files provided with CU-SeeMe.  Cogger Dep. 235:18-236:23.  Citrix argues that CU-SeeMe was both described in a printed publication and in public use more than one year prior to the priority date of Pixion's patents.  For the purposes of this motion, Citrix relies on the ReadMe files to describe the functions of CU-SeeMe.  Citrix provides claim charts and arguments matching the elements of the patents in suit to the descriptions provided in the ReadMe files.  The particular ReadMe files relied on by Citrix are (1) the text file labeled "CU-SeeMe ReadMe file 1-16-95," Martinson Decl., Ex. 14 (the "Jan. 16, 1995 ReadMe File"), and (2) the text file labeled "Cornell Reflector Version 3.00B1" (the "3.00B1 Reflector ReadMe File"), *id.*, Ex. 15.

### 2.    Anticipation analysis

Under 35 U.S.C. § 102(b),

A person shall be entitled to a patent unless–

* * *

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

In determining validity of a patent claim over the prior art, the same two-step process applies as in infringement analysis. The first step is the claim construction by the Court. *See Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999). The second step is a comparison of the asserted claims against the prior art reference.   A determination that a claim is invalid for

---

[6]According to Citrix's invalidity expert Dr. Jeffay, the name "ReadMe" was a play on the Alice in Wonderland story, in which Alice confronts magical treats labeled "Eat Me" and "Drink Me."

United States District Court
For the Northern District of California

anticipation requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference." *Celeritas Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360, 47 USPQ2d 1516, 1522 (Fed. Cir. 1998). The Federal Circuit has held that "it is axiomatic that that which would literally infringe if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001); *see also Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987). Thus, with respect to an allegedly anticipating device, anticipation involves the same inquiry as infringement, guided by the Court's claim construction. *See Rambus Inc. v. Hynix Semiconductor Inc.*, 628 F. Supp. 2d 1114, 1120 (N.D. Cal. 2008).

### 3.    Publication and  public use

Citrix presents the ReadMe files distributed with CU-SeeMe as an anticipating publication, and the CU-SeeMe program itself as an anticipating device in public use.  Pixion argues that the ReadMe files distributed with the CU-SeeMe software are not sufficient to meet the prior publication standard for anticipation because they do not provide sufficient detail to enable a person skilled in the art to make and use the invention. *Id.* (*citing In re Donahue*, 766 F.2d 531 (Fed. Cir. 1985) ("[E]ven if the claimed invention is disclosed in a printed publication, that disclosure will not suffice as prior art if it was not enabling.")). The Court finds no need to reach the question of whether the ReadMe files are enabling because the public use of the CU-SeeMe system is sufficient to address anticipation.[7]

The Federal Circuit has reaffirmed that "Section 102(b) may bar patentability by anticipation if the device used in public includes every limitation of the later claimed invention." *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008) (citing *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002)). With respect to a prior art reference that is a device rather than a publication, "public use itself need not be enabling." *Id.*, quoting *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) ("Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry."). Rather, the court must determine "whether the public use related to

---

[7] However, courts have found software manuals to be sufficiently enabling.  *See Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D. Del. 2006), aff'd, 238 F. App'x 605 (Fed. Cir. 2007)("manuals are themselves prior art and provide clear and convincing evidence sufficient to support a conclusion of invalidity").

a device that embodied the invention." *Id; see also Taussig v. Jack & Jill One Hour Cleaners, No. 12, Inc.*, 462 F. Supp. 1026, 1038 (N.D.Ohio 1978) (prior use or sale, to invalidate patent, must embody all elements and principles of claimed invention, but is sufficient, to invalidate, if it embodies substantially the principles and elements of the patent).[8]

### 4.    Presumption of patent validity

A patent is presumed valid after the PTO examination process, based on "the basic proposition that a government agency such as the then Patent Office was presumed to do its job." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (*abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)) (citing *Morgan v. Daniels*, 153 U.S. 120 (1894)). The defendant carries a high burden on summary judgment of invalidity, as the "moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr. Labs*, 251 F. 3d 955, 962 (Fed. Cir. 2001). The presumption of validity can nonetheless be overcome with sufficient evidence. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) ("The validity of a patent is always subject to plenary challenge on its merits. A court may invalidate a patent on any substantive ground, whether or not that ground was considered by the patent examiner.").[9]

The moving party's burden is "especially difficult" when the prior art references presented were considered by the patent examiner during prosecution. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004). But when additional evidence is presented by the moving party, "the burden may be more or less easily carried because of the additional evidence." *Applied Materials, Inc. v. Advanced*

---

[8] Because the Court will limit its analysis to prior public use, Pixion's reliance on cases concerned only with prior publication is unavailing. See e.g. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (holding prior publication "must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements arranged as in the claim." (internal citations omitted)).

[9] See also *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985) ("[t]he Examiner's decision, on an original or reissue application, is never binding on the court. It is, however, evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence.").

United States District Court
For the Northern District of California

*Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996). New evidence supporting an invalidity contention may "carry more weight" in an infringement action than evidence previously considered by the PTO. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2251 (2011).[10] As the Supreme Court has held, "simply put, if the PTO did not have all material facts before it, its considered judgment may lose significant force. . . . And, concomitantly, the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain." *Id.* (internal citations omitted).

The Court previously addressed CU-SeeMe in the context of Citrix's March 1, 2012 Motion for Leave to Amend Answer and Counterclaims. Doc. 132. In that motion, Citrix sought to add claims of inequitable conduct based on the disclosure by an inventor of the patents-in-suit that he used CU-SeeMe prior to seeking the patents, but did not disclose CU-SeeMe to the USPTO in an Information Disclosure Statement of the parent patents ('515 and '191). The Court denied Citrix's motion on the grounds that CU-SeeMe was disclosed to the USPTO during prosecution of the child patents ('304 and '331). The child patents issued despite the disclosure. In disallowing the amendment, the Court noted that the Federal Circuit had recently raised the requirement for finding inequitable conduct to "but for materiality," in *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc). The Court held that because the substantially similar child patents issued despite reference to CU-SeeMe, Citrix did not meet its burden in showing the parent patents would not have issued had CU-SeeMe been disclosed. Doc. 132 at 4. Furthermore, for a finding of inequitable conduct, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Therasense* at 1290. Citrix had not produced sufficient evidence of intent to deceive to justify amending the counterclaims.

Citrix now moves to invalidate the patents despite the prior art disclosure to the USPTO. Some of the CU-SeeMe materials relied upon by Citrix appear in the file histories for the '331 and '489 patents, including the ReadMe files distributed with the software and the ORCA brochure (Springer

---

[10] Citing *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-1356 (Fed.Cir. 2000) ("[T]he alleged infringer's burden may be more easily carried because of th[e] additional [evidence]"); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (similar).

Decl., Ex. 13, Excerpts from '331 and '489 File Histories).  However, additional evidence has been presented in support of this motion: 1) the video segment of CBS "Up To The Minute" demonstrating use of CU-SeeMe  (Martinson Decl. Ex. 23);  2) the KOCT-TV "Global Schoolhouse" video segment showing use of CU-SeeMe in schools (Martinson Decl. Ex. 24);  3) expert report of Dr. Jeffay, who had cited CU-SeeMe source code that was not available to the PTO (Martinson Decl. Ex. 29 at 13-14);  4) sworn testimony of Mr. Cogger, the original project manager for CU-SeeMe (Martinson Decl. Ex. 13, Ex. 35); 5) National Science Foundation (NSF) proposals indicating accomplishments (Martinson Decl. Ex. 20 and 21); 6) an oral history document produced by Cornell University documenting the work of Mr. Cogger on CU-SeeMe (Martinson Decl. Ex. 34, part 2); and 7) an article by Mr. Dorcey, a developer of CU-SeeMe, in the publication Connexions, Volume 3, March 1995, describing the functions of CU-SeeMe (Martinson Decl. Ex. 34, part 3).  The Court, therefore, will consider the new evidence of invalidity on its merits, in light of the governing clear and convincing standard. See *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011) ("When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account"); *see also Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011) ("An added burden of deference to the PTO is not required, however, with respect to invalidity arguments based on evidence that the PTO did not consider").

### 5.      Corroborating evidence

Pixion argues that the operability and actual functions of CU-SeeMe cannot be verified with the evidence submitted. See Pl.'s Opp. at 19.  Pixion contends that Citrix fails to establish that CU-SeeMe actually operated as described in the ReadMe files. Dr. Stevenson, Pixion's expert, personally used CU-SeeMe between June 1995 and 1998, and testified that CU-SeeMe "didn't work that well" and was "flaky"; that "whatever they were doing was not working."  Springer Decl., Ex. 1 (Stevenson Dep.) 30:2-9, 19:21-20:6, 62:10-12.  Pixion argues that because CU-SeeMe did not work as described in the ReadMe files, it could not have anticipated the asserted claims.  Pl.'s Opp. at 25.

Citrix uses the ReadMe files to specifically describe CU-SeeMe functions as implemented at

United States District Court
For the Northern District of California

a particular date, and submits the television segments, NSF grant reports, publications, and Dr. Cogger's testimony to corroborate the functions described therein. *See* Martinson Decl., Exs. 13, 23, 24, 29, 35. In *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc., 522 F.3d 1348 (Fed. Cir. 2008)*, the court properly considered "testimony from other witnesses, documentary evidence, and Zenith's own admissions" as well as "a product literature sheet describing features" in finding the patentee's claims invalid due to prior public use of an anticipating device. *Id.* at 1358. The Federal Circuit has also upheld the use of product manuals to corroborate testimony in claims of anticipation. *See Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D. Del. 2006) aff'd, 238 F. App'x 605 (Fed. Cir. 2007)("Mr. Wu testified from his personal knowledge. . . and his testimony is corroborated by the product manuals"). Additionally, the Circuit upheld the use of business letters, invoices, and employee affidavits as corroborating evidence of prior art. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001). Therefore, the evidence submitted by Citrix may be used to corroborate the functionality of CU-SeeMe.

Pixion further contends that reliance on testimony provided by Mr. Cogger, the CU-SeeMe project manager, is improper, because he is a "hybrid percipient-expert witness." Pixion also argues that the ReadMe files have not been corroborated and are therefore inadmissible hearsay, stating that "Cogger did not testify that each statement made in the CU-SeeMe ReadMe files is accurate and correct, nor could he," and therefore, "because the documents remain uncorroborated and verified, they are inadmissible to establish the truth of their content." Pl.'s Opp. at 19 (citing *Twentieth Century Fox Film Corp. v. Entm't. Dis*Dep., 429 F.3d 869, 880 n.3 (9th Cir. 2005) (affirming exclusion of published article as hearsay).

"Corroborating evidence is evaluated under a 'rule of reason' analysis." *Linear Tech. Corp. v. Impala Linear Corp*., 379 F.3d 1311, 1327 (Fed. Cir. 2004). The Court finds Mr. Cogger's testimony is admissible as percipient witness testimony. The Court need not address his alleged expert witness status at this stage, because the Court relies on Mr. Cogger's testimony only insofar as it relates to his percipient knowledge of CU-SeeMe. Mr. Cogger himself created the idea for CU-SeeMe and was its software development manager. Cogger Dep., 209:3-210:6. Mr. Cogger provided documents, electronic records, and the videos in response to a subpoena. *Id.* , 8:13-19. The ReadMe file lists Mr. Cogger as

18

United States District Court
For the Northern District of California

1  the author. Jan. 16, 1995 ReadMe File at 1. Mr. Cogger corroborated the accuracy of the ReadMe file.

2  Cogger Dep., 236:1-6. He further testified that at the time of writing the file, he tested CU-SeeMe to

3  ensure that it functioned in the manner described. *Id.*, 236:11-14. His testimony is further corroborated

4  by contemporaneous media presentations of the software, articles, and NSF grant reports. *See* Martinson

5  Decl. Ex. 20-24, 29, 34.

6      In addition, Citrix's expert Dr. Jeffay analyzed the source code and cited it in his invalidity

7  charts. Martinson Reply Decl., Exs. 29-31, 33. Dr. Jeffay also testified that the source code for CU-

8  SeeMe confirmed its functionality. *Id.*, Ex. 37 (Jeffay Dep.) 25:2-4 ("By reading the source code, I'm

9  able to determine what the system was programmed to do, and my review of the source code indicates

10 that what it was programmed to do is entirely consistent with the functions specified in the readme file

11 and Mr. Cogger's description of the operation of the system."). Moreover, the contemporaneous media

12 reports, including live demonstrations of CU-SeeMe, clearly show the software functioning. Martinson

13 Decl., Exs. 23, 24. The Court finds that Mr. Cogger's testimony and the ReadMe files were

14 authenticated by sworn affidavits and corroborated by evidence in the record, and are admissible.

15     The Court further finds that Pixion has not presented sufficient facts to challenge the operation

16 of CU-SeeMe as described in the ReadMe files, affidavits, and publications. *See TypeRight Keyboard*

17 *Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed .Cir. 2004) ("Summary judgment should not be

18 denied simply because the opposing party asserts that the movant's witnesses are not to be believed.").

19 Rather, the opposing party must offer "specific facts that call into question the credibility of the movant's

20 witnesses." *Id; see also Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D.

21 Del. 2006) *aff'd* 238 F. App'x 605 (Fed. Cir. 2007).("Here, no specific facts are offered, and the

22 testimony corroborated by the product manuals shows anticipation by clear and convincing

23 evidence.").[11]

24 ──────────────

25 [11] *See also Zenith Electronics,* 522 F.3d at 1356 (Fed. Cir. 2008) ("Although Zenith contests
   much of PDI's evidence of public use, we find that Zenith's arguments do not establish a genuine issue

26 of material fact on that issue. . . . With respect to the product literature sheet, Zenith complains that Mr.
   Rockwood was unable to state with certainty whether the sheet described the capacitor version of the

27 205-E pillow speaker or Curbell's subsequently developed battery-powered version. . . Even so, the
   product literature sheet and Mr. Rockwood's testimony support the conclusion that the capacitor version

28 of the 205-E pillow speaker – a precursor to the battery version – was available for use with the J20525
   television at least as early as 1992.").

1   The Court finds that Citrix established the functionality of CU-SeeMe as described in the dated

2   materials by clear and convincing evidence.

3

4   **6.     Dates of the public use and versions of CU-SeeMe**

5   The parties agree that the patents-in-suit claim a priority date of March 26, 1996. Therefore,

6   Citrix must demonstrate that CU-SeeMe was in public use more than one year prior to that, i.e. before

7   March 26, 1995.  Pixion argues that Citrix fails to show that the version of CU-SeeMe available prior

8   to March 26, 1995 embodied all of the required claim elements, which may have been added in later

9   versions.  According to Citrix, one of the first uses of CU-SeeMe occurred in 1993 in connection with

10  "The Global Schoolhouse Project." Def.'s MSJ at 14.  The Global Schoolhouse Project used CU-SeeMe

11  to connect students from four geographically dispersed regions (Great Britain, California, Virginia and

12  Tennesee) over the internet. Cogger Dep., 26:2-29:14. Oceanside Community Television (KOCT-TV)

13  in Oceanside, California produced a 30 minute program on CU-SeeMe and the Global Schoolhouse

14  Project dated March 16, 1994. Martinson Decl., Ex. 19.  The program demonstrates CU-SeeMe in use,

15  showing groups of students communicating with one another via video displays on their computers. *Id.*

16  The particular ReadMe files relied on by Citrix are (1) the text file labeled "CU-SeeMe ReadMe

17  file 1-16-95" (the "Jan. 16, 1995 ReadMe File"), Martinson Decl., Ex. 14; and (2) the text file labeled

18  "Cornell Reflector Version 3.00B1 1-16-95" (the "3.00B1 Reflector ReadMe File"), *id.*, Ex. 15.  Mr.

19  Cogger, the  CU-SeeMe project manager, also testified that Cornell hosted a public reflector, the server

20  used to connect a multiparty conference, as of January 1995.  Cogger Dep. 141:11-142:6.  A report to

21  the NSF dated "November 1994" indicates widespread use of CU-SeeMe by that date:

> Reflecting this growth in use, the CU-SeeMe discussion list on the Internet has grown
> sharply with releases of new Mac versions and the first release for Windows during
> 1994: from 25 members in early January, there are now about1100.  CU-SeeMe received
> widespread media coverage in the last year with articles and/or mentions in Time,
> Newsweek, the New York Times, and New Media, Board watch, (cover story) Syllabus,
> EdTelligence, Mac Week, Internet World, Cornell and MIT magazines.  CU-SeeMe was
> featured in the first issue of Internaut, a new Internet magazine designed to be read
> on-line through the Mosaic interface, and also mentioned with a color illustration in
> WIRED magazine.  CU-SeeMe demonstrations enlivened the Information Industry
> Association (IIA) conference, the Net'94 conference, a keynote address to 4000
> conferees at the Interop conference in May and again in October in Paris, and a recent
> conference of international educators at the American University in Moscow.

1   Springer Decl., Ex. 20 at 3.

2        Finally, Peter Madams, one of the inventors of the patents in suit, testified that he had used CU-

3   SeeMe "years before" August 1995.  Martinson Decl., Ex. 20 (Madams Dep., 138:24-139:2).  The Court

4   finds that Citrix has sufficiently established the public use of CU-SeeMe more that one year prior to

5   March 26, 1996, and the ReadMe files accurately describe CU-SeeMe functionality as of January 1995.

6

7        **7.        Disclosure of Each Claim Limitation**

8        In order to establish anticipation, Citrix must show that CU-SeeMe met each element of the

9   asserted claims.

10

11            **a.        Claim construction**

12       As noted above, in order to show that a patent claim is invalid as anticipated, "the accused

13   infringer must show by clear and convincing evidence that a single prior art reference discloses each and

14   every element of a claimed invention."  *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784,

15   796 (Fed. Cir. 2010).  Courts have characterized "a classic test of anticipation" as "[t]hat which would

16   literally infringe if later in time anticipates if earlier than the date of invention." *Marion Merrell Dow,*

17   *Inc. v. Geneva Pharmaceuticals, Inc.*, 877 F. Supp. 531, 535 (D. Colo. 1994) (quoting *Lewmar Marine,*

18   *Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987)).  Moreover, claims "must be construed in the

19   identical way for both infringement and validity." *Jackson Jordan, Inc. v. Plasser Am. Corp.*, 824 F.2d

20   977 (Fed. Cir. 1987); *Kimberly-Clark Corp. v. Johnson & Johnson Co.*, 745 F.2d 1437, 1449 (Fed. Cir.

21   1984).  The patentee may not simultaneously argue for a broad claim construction in asserting

22   infringement contentions, and then pursue a narrower construction during invalidity determination.  *See*

23   *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001)

24   ("Moreover, Bristol would have us construe the claims as limited to those instances of practicing the

25   claimed method that achieve the stated result for purposes of validity, but as encompassing all instances

26   of carrying out the physical steps for purposes of infringement.  Again, Bristol cannot have it both

27   ways.").  Therefore, the parties are bound by the same claim construction adopted in the infringement

28   analysis above.

**United States District Court**
For the Northern District of California

21

### b.     The '515 and '304 Patents

Citrix matches each of the elements in this claim to descriptions of CU-SeeMe provided in the ReadMe files.  The '515 and '304 claims are substantially the same, except that the child patent '304 adds the functionality that client capability validation is completed in "real time."   The disputed elements of Claim 1 are highlighted:

> **1.** A conferencing system comprising:
> a **conference server**;
> at least one client the at least one client including a web browser; and
> at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after the client-server connection is established, the client-server connection established via the **web browser** at the at least one client having been navigated to a **Universal Resource Locator** associated with a conference, and wherein **one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client** validated after establishing the client-server connection but prior to the at least one client joining the conference.  ('515 Patent, 36:8-24)

### i.     "Conferencing System"

Pixion does not dispute that CU-SeeMe is a conferencing system.  The Jan. 16, 1995 ReadMe File describes CU-SeeMe as a "desktop video conferencing system" and states it provides "a one-to-one conference, or by use of a reflector, a one-to-many, a several-to-several, or a several-to-many conference depending on user needs and hardware capabilities . . . So far as we know, CU-SeeMe was the first software available for the Macintosh to support real-time multi-party videoconferencing on the Internet." Jan. 16, 1995 ReadMe File at 2. The Court finds this claim limitation is met.

### ii.     "Conference Server"

Pixion disputes whether the application referred to as the CU-SeeMe reflector qualifies as a conference server.  Documents describing the reflector characterize it as follows: "You will need to use a reflector to have a multiparty conference on the Internet.  The CU-SeeMe reflector program is a Unix program which we have tested so far only on Sun Sparc workstations. . . .  As of January, 1995, Cornell regularly runs a reflector for testing at 132.236.91.204. . . ."  Def.'s MSJ at 18, citing Ex. 14, Cogger Depo. Ex. 10, page 13 (How to Test CU-SeeMe). *See also* Jeffay Invalidity Rep. (Martinson Decl. Ex.

United States District Court
For the Northern District of California

21) ¶ 118 ("The reflector was a conference server.  The reflector program ran on at least a Unix based Sun Sparc workstation and delivered conference data it received from attendees of the conference to one another.").

At claim construction, the Court construed the term "conference server" as "a computer or several networked computers running conference software and providing conference data to a client computer." Pixion's proposed definition was "a computer or several networked computers running conference software and configured to provide conference data to at least one client."  Despite the fact that the Court adopted a nearly identical definition, Pixion now argues that the Court should limit the definition to a "smart" server that "must be capable of performing complex analyses and functions." Pl. Opp. at 20-21, citing Springer Decl., Ex. 17 (Klausner Rep.), ¶¶ 84-85.  Pixion does not dispute that the CU-SeeMe reflector application meets the adopted definition of "conference server" but argues that it was a "dumb" server that "merely reflected data without complex analysis or transformation."  Klausner Rep., ¶¶ 84-85.

Pixion's proposed redefinition of a claim term is not only impermissibly vague, but also entirely unsupported by any specific references to the patents.  It is established that "[o]nce a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for the purposes of trial." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).  The Court finds insufficient grounds to alter the previously adopted definition.  The Court wholly agrees with Pixion that "[c]laim terms are not construed in a vacuum divorced from specification." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).  However, Pixion does not show anything in the specification that requires a limitation to "smart" server advanced by Pixion in opposition to this motion over its original definition. The patent claims do not provide further limitations on "conference server," and the specification discloses:

> In a specific implementation of the desktop conferencing system, conferee client computers ("conferee clients") connect to the "conference server," a computer or several networked computers (any of which may also be used by a conferee as a client computer) running conferencing software, typically by navigating a World Wide Web ("WWW" or "Web") browser through a predetermined Universal Resource Locator ("URL" ) that indicates a Web page describing the conference. The conference can be set up any time earlier by anyone with access to this server function. '515, 2:24-33.

23

**United States District Court**
For the Northern District of California

1    A "presenter uses his or her computer to begin a conference presentation by connecting to the

2    conference server." '515, 2:54-55.  Some proposed embodiments contemplate potential features: "In

3    order to provide synchrony in the system, conference server 14 can issue time synchronization signals.

4    The conference server may also add time-stamps on receipt of blocks, and will need to update

5    time-stamps when a recorded or archived conference is, played back." '515, 8:19-23.  However, in the

6    absence of clear intent to limit claim scope, it would be improper to read limitations from a preferred

7    embodiments into the claim language.  *See Comark*, 156 F.3d at 1187;  *see also Decisioning.com, Inc.*

8    *v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *Howmedica Osteonics Corp. v.*

9    *Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008).

10    Recently, the Federal Circuit held that the district court improperly read a limitation into the

11    stand-alone phrase "registration server" when "distinctions in specification descriptions avoid any hint

12    that the inventors clearly disavowed claim scope" and the specification "does not even suggest that

13    every embodiment of the invention must contain all [of the] features."  *Digital-Vending Services Int'l,*

14    *LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012).  *See also In re Johnston*, 435 F.3d

15    1381, 1384 (Fed. Cir. 2006) (refusing to alter a broad claim construction originally sought by party: "in

16    this case Mr. Johnston himself gave 'pipe' the broad meaning he now criticizes.").  The Court therefore

17    declines to modify its original construction of "conference server," and finds that this claim limitation

18    is met by the reflector.

19

20

21          iii.      **"the client-server connection established via the web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference"**

22

23    The parties agreed at claim construction that a "web browser" was defined as "an application

24    executed by a computer to navigate among network resources." Similarly, the parties agreed that

25    "Uniform Resource Locator," or "URL" meant "an identifier that specifies where the conference is

26    located on a network."  According to Citrix, CU-SeeMe allowed the user to navigate among reflectors

27    using the reflector's IP address.  The Jan. 16, 1995 ReadMe files states that "As an alternative to

28    repeatedly typing in IP addresses, you may use Edit Nicknames from the Edit menu to set up Nicknames

United States District Court
For the Northern District of California

for IP addresses.  Then use Connect To > from the Connection menu to make connections."  Jan. 16, 1995 ReadMe at 4.   Citrix argues that using the agreed-upon definition, CU-SeeMe met this claim limitation because CU-SeeMe allowed the user to connect to servers available on the network via an identifier that specified the server's location, i.e. the IP address or the associated nickname.  Pixion argues that because the ReadMe file stated that ""[In] a further release . . . it should be possible to set up web brousers [sic] to establish CU-SeeMe sessions," that phrase indicates that it was a future feature that was not yet available.  Klausner Rep. ¶¶ 109-110.

However, the court finds that the CU-SeeMe software itself meets the definition of "web browser" as "an application executed by a computer to navigate among network resources," and an IP address is an identifier under the adopted definition of "Uniform Resource Locator" as "an identifier that specifies where the conference is located on a network."  The software allowed users to connect to a server, in much the same manner as commercial web browsers which were in early stages of development at the time. *See* Jeffay Invalidity Rep. at 11.  No other features of web browsers are included in the definition adopted by the parties, nor does the definition require the use of separate stand-alone web browser applications.  It is true that the statement Pixion points to evinces that stand-alone web browser functionality was not yet available to CU-SeeMe by March 26, 1995.[12]  However, in this infringement suit, the parties are bound by the definitions of the terms adopted during claim construction, under which the CU-SeeMe application is itself a web browser.  It is well established that the patentee is bound by the definition adopted in proceedings before the PTO. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning"); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1326 (Fed. Cir. 2002)("the prosecution history may demonstrate that the patentee intended to deviate from a term's ordinary and accustomed meaning").  The same reasoning applies to the definition adopted by the patentee in an infringement suit.  Accordingly, the Court finds that Pixion is bound by the definition of "web browser" it has explicitly adopted in prior proceedings

---

[12]CU-SeeMe appears to have implemented this functionality by the time of the CBS news report on August 25, 1995.  This airing date is after the critical anticipation date of March 26, 1995 and therefore not relied on by Citrix.

before this Court, which is met by the CU-SeeMe application itself.  Therefore, this claim limitation is met.

In the alternative, the Court finds that adapting the CU-SeeMe conference system to work with stand-alone web browsers would have been obvious to a person of ordinary skill in the art at the time. Section 103 of Title 35 "forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1734 (2007) (quoting 35 U.S.C. § 103).  The central  inquiry in this analysis is that "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 1740.  The information provided in the ReadMe files is sufficient to teach one skilled in the art how to connect to an IP address to initiate the conference, and suggests the use of conventional web browsers to implement this step.  Morever, the  CBS news report on August 25, 1995 clearly shows a Netscape browser being used to start a connection via CU-SeeMe with a conference participant when Mr. Cogger clicks on the link for John Graham.  Martinson Decl., Ex. 18 (CBS "Up to the Minute"  8/25/95).  In  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), the Federal Circuit  held that modification of a prior art electronic bidding system to incorporate conventional web browser functionality would have been obvious to one of ordinary skill in the art in 1998.  *Id.* at 1327.  In the present case, the incorporation of web browser functionality was clearly suggested by the ReadMe files and would have been obvious to a person of ordinary skill in the art.

                                     iv.    **"one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client validated after establishing the client-server connection but prior to the at least one client joining the conference"**

The most critical claim of the patents is the function that client capabilities are validated after establishing the client-server connection but prior to joining the conference, and that the conferencing data is  based on those capabilities. To demonstrate disclosure of this claim, Citrix's expert relies on three features of CU-SeeMe: 1)  CU-SeeMe could be configured to require a conference ID in order to join the conference; 2) the reflector also could enforce a requirement that clients use a minimum version

United States District Court
For the Northern District of California

number of the CU SeeMe client software; 3) the reflector included the ability to enforce transmission rate "caps" for the clients, including the automatic adjustment of the cap based on packet loss rate. Jeffay Invalidity Rep., ¶¶ 130-136.

First, Pixion argues that CU-SeeMe does not disclose validation of a client's capabilities "after establishing the client-server connection but prior to the at least one client joining the conference," as required by the '515 and '314 patents. *Id.* ¶ 65. Pixion's invalidity expert, Mr. Klausner contends that the feature relied upon by Citrix to meet this element – the cap feature – is not active in the time between establishing a network connection and joining the conference. Instead, Pixion argues that "the rate-control limitation set by the conference participant using the cap feature takes place *before* establishing the client-server connection," because the minimum and maximum values "were set by conference participants prior to establishing a client server connection." Klausner Rep. ¶ 67. However, the feature as described in the 3.00B1Reflector ReadMe File states that, "if a participant sets his maximum transmission rate above the cap that you specified he will automatically be disconnected from the reflector and prohibited to reconnect for the specified hold-down-time." 3.00B1 Reflector ReadMe File at 4. Clearly, a participant cannot be disconnected without first establishing a connection. The limitation is therefore disclosed.

Second, Pixion argues that CU-SeeMe did not disclose provision of data "based on the current capabilities of the client." Klausner Rep. ¶ 71. At claim construction, the Court construed "characteristics of the provided conferencing data" to mean "qualities, properties, or attributes . . . including size, content, rate of transmission and reception." The Court construed the term "capabilities of the at least one client" to mean "client parameters relating to resources available to the client, including the client's display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to the client." Klausner's expert report argues that neither the ability to configure a CU-SeeMe reflector to require a particular conference ID in order to join the conference, nor the feature allowing a reflector to enforce maximum transmission rate caps, results in conferencing data being provided based on current capabilities. Instead, according to Klausner, these features function like "'on' or 'off' switches – all or nothing, and are independent of current client capabilities" because they result in a user either gaining

United States District Court
For the Northern District of California

1    access to the conference or being unable to connect.   Klausner Rep. ¶ 72

2        The Court agrees with Pixion that "client capabilities" does not reach factors such as a

3    conference ID number, which is not related to resources available to the client, but is simply a number

4    chosen by the user managing the conference to control access. *See* Cornell Reflector Version 3.00B1

5    ReadMe at 2.

6        The Court, however, finds that the cap feature does meet this claim limitation. The cap feature

7    includes both a user-set maximum cap and an automatic cap adjustment.  Pixion does not address the

8    automatic cap adjustment, which monitors the packet loss rate and adjusts the frame capture rate in

9    response.  The cap feature is described in the Jan. 16, 1995 ReadMe File as follows:

10       RATES BAR When someone requests a connection (or you open a connection) and you
11       start sending – you will also see, in addition to framerate, an indication of bandwidth in
         Kbits/sec.  On the right end of the rates bar under the local window is shown a "cap"
12       which limits bandwidth used for sending and hence framerate, depending on amount of
         motion.  The minimum and maximum values for the cap can be adjusted by a control in
13       the Transmission panel . . . If the receivers report packet loss in excess of 5%, the
         program assumes network congestion and automatically lowers the cap.  It will be
         adjusted back up toward the max value if loss reports agregate [sic] to less than 5%.
14                                                                 Jan. 16, 1995 ReadMe File at 5.

15   It is also described in the June 1993 NSF proposal and progress report:

16       4.4.1. Traffic Shaping -- Currently CU-SeeMe provides a user-adjustable cap on
17       maximum bandwidth to be used. The frame rate is simply adjusted downward by
         delaying frame capture as necessary to stay below the cap. The cap is also
18       dynamically adjusted, according to loss reports from other conference
         participants.
19                                                                    Springer Decl. Ex. 21 at 7.

20   Mr. Cogger described the adjustment process in his testimony:

21       Well, that at the time [1993] of sending this in, we had already implemented loss
         reports from the receivers. Anybody receiving a stream would be sending a
22       regular packet to keep the connection alive, and within that packet, I believe, the
         recent amount of lost packets, as seen by the receiver, would be reported so that
23       a sender could – now let's for the moment talk about just a one-to-one
         transmission. The sender would be serializing the packets so the receiver could
24       tell if packets were missing by virtue of having been dropped in the Internet. And
         the receiver would keep a count of that and periodically send that count back
25       when it was sending its keep-alive packet, and then the receiver could make the
         intelligent adjustment by saying, Well, if only so many packets per so often or
26       so many frames per so often are going to get to there, there's no use in me -- no
         use to anybody in me sending more than that. So it would reduce the cap.
27                                                                    Cogger Dep. 49:6-19.

     As noted, the Court's construction of "characteristics of the provided conferencing data" is

28

"qualities, properties, or attributes . . . including size, content, rate of transmission and reception." The frame capture rate is a quality, property or attribute of conference data. "Client capabilities" was construed as "client parameters relating to resources available to the client, including the client's display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to the client." The packet loss rate is a parameter relating to resources available to the client, specifically the quality of the network connection and the presence of network congestion, which depends on the available bandwidth. *See* Jan. 16, 1995 ReadMe File at 5. The cap feature therefore changes a characteristic of the provided conference data (the frame capture rate) based on client capabilities (the packet loss rate). Moreover, the user-set maximum cap can be validated before the participant joins the conference. *See* 3.00B1 Reflector ReadMe File at 4 ("[I]f a participant sets his maximum transmission rate above the cap that you specified he will automatically be disconnected from the reflector and prohibited to reconnect for the specified hold-down-time."). The Court therefore finds that this limitation is disclosed by CU-SeeMe.

In sum, the Court finds clear and convincing evidence that CU-SeeMe disclosed all of the elements of the asserted claims of the '515 and '304 patents, and therefore the asserted claims are invalid for anticipation by prior public use.

### c. '191 and '331 Patents

Citrix also argues that the '191 and '331 patents are invalidated by CU-SeeMe. The only substantial difference between the '191 and '331 patents and the '515 and '304 patents is the time at which information or capabilities about the computers participating in the conference are examined. As noted above, while '515 and '304 dealt with validating client capabilities prior to clients joining the conference, '191 and '331 examine client information during the conference. Claim 1 of '331 ends:

> . . . and wherein one or more characteristics of the provided conferencing data are based on client or server information **examined subsequent** to both the client-server connection having been established and the client joining the conference.

As with '515/'304, the only difference between '191 and '331 is that '331 adds the limitation that the examination is done "in real time."

Because the language is otherwise the same, Citrix does not repeat its arguments with respect to most of the elements of '191/'331. In addressing "client or server information" examined *during* the conference, Citrix again points to the "cap" feature described above. Citrix argues that this demonstrates examined "client or server information" (in this case, packet loss) during the conference and based characteristics of the provided data on that information (by adjusting the cap). *See* Jan. 16, 1995 ReadMe File at 5 ("If the receivers report packet loss in excess of 5% , the program assumes network congestion and automatically lowers the cap. It will be adjusted back up toward the max value if loss reports agregate [sic] to less than 5%."). The Court agrees, and finds this limitation is disclosed for the same reasons discussed above. *See supra*, Sec. B(7)(b)(iv).

Pixion further argues that Dr. Jeffay also fails to establish that CU-SeeMe operated in "real time" because "CU-SeeMe operated with delay and with significant amounts of jitter and was not enabled for real-time as taught in the Asserted Patents." Klausner Rep. ¶ 80. At claim construction, the parties agreed that "real time" should be construed in accordance with its plain and ordinary meaning. Claim Const. Order (Doc. 91) at 5. The KOCT-TV "Global Schoolhouse" video clearly shows conference participants engaging in conversation that is in "real time" in the plain and ordinary sense. Martinson Decl., Ex. 24. The Court finds that this claim limitation is met.

The Court finds clear and convincing evidence that CU-SeeMe disclosed all of the elements of the asserted claims of the '191 and '331 patents, and therefore the asserted claims are invalid for anticipation by prior public use.

### d.    '489 Patent

The '489 patent addresses the methods for introducing a client to a conference. The claims at issue are:

**1.** A method for introducing a client to a conference, the method comprising:
**publishing a conference listing** corresponding to the conference, wherein the conference listing is located by a client device seeking to enter into the corresponding conference;
**receiving indicia from a client device** indicating that a web browser corresponding to the client device has been pointed to the conference listing;
**receiving information allowing for conference attendance** by the client device;
connecting the conference server and the client device; and
allowing for entrance of the client into the conference.

**4.** The method of claim 1, wherein the conference listing is published for subsequent location using a uniform resource locator (URL).

**5.** The method of claim 1, wherein the receipt of information allowing for conference attendance occurs after a validation operation.

'489, 35:17-36:7, 16-21.

Citrix again addresses each element via the ReadMe files.

### i.    "Publishing a conference listing corresponding to the conference"

In the Claim Construction Order, the Court construed "publishing" to mean "making/made known, findable, or locatable." The ReadMe file states that, "as of January, 1995, Cornell University regularly runs a reflector for testing at 132.236.91.204." Jan. 16, 1995 ReadMe File at 13. Dr. Jeffay also included a list of CU-SeeMe reflectors hosted by other universities and organizations, with names and email addresses of contact persons, that was posted on the Internet and dated January 3, 1994. ("Live Reflectors January 3, 1994") Jeffay Invalidity Rep. ¶ 424. Citrix argues that CU-SeeMe therefore published a conference listing (the IP address) that a person could join. Pixion argues that patent specification requires "publication of a URL, which is then located via a service such as ULS.TM or LDAP.TM." Klausner Rep. ¶ 119. However, as the Court discussed with respect to "conference server" above, the Court holds the parties to the claim definitions adopted during claim construction and will not permit a limitation from an embodiment to be imported into the claim term. *See supra* Section B(7)(b)(ii);  *see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008).   In this case, "publishing" simply means "making/made known, findable, or locatable." Therefore, the Court finds this claim limitation is met.

### ii.    "Receiving indicia from a client device indicating that a web browser corresponding to the client device has been pointed to the conference listing"

The Court construed the term "receiving indicia from a client device" to mean "receiving a sign from the client device." The "web browser" limitation was addressed in Section B(7)(b)(iii), *supra*.

Again, the Court finds that CU-SeeMe itself acted as web browser pursuant to the definition of that term adopted by the parties. Citrix argues that the "conference ID" function (CONF-ID) of CU-SeeMe constituted a sign from the client device indicating that a client has been pointed to the conference listing, because the server receives the client's conference ID in order to allow or deny access to a participant. In addition, Citrix contends that two other parameters constituted a sign from the client: 1) information about the client's software version that could be required by the conference manager to ensure compliance with minimum version requirement, and 2) the client's setting of "cap" to ensure it did not exceed the reflector's "cap" limit. Jeffay Invalidity Rep. ¶¶ 425-432. The Court agrees that this information would be received by the server when the client has been pointed to a conference.

Further, the 3.00B1 Reflector ReadMe file shows CU-SeeMe read in the participant's IP address for the functions ADMIT and DENY. 3.00B1 Reflector ReadMe File at 4, 9. These functions allowed the conference manager to specify in advance IP addresses that would be admitted to the conference and those that would be banned. In order to make that determination, CU-SeeMe would have to receive the connecting participant's IP address, which is a sign that a client has been pointed to the conference.

The Court finds that this claim limitation is met.

### iii. "Receiving information allowing for conference attendance by the client device"

During claim construction, the Court construed this term according to the plain and ordinary meaning of its constituent words, noting that one example of information allowing for conference attendance is a key. The embodiments contemplated a key function that can determine the attendee's privileges, ranging from controlling a pointer to becoming a presenter. '489, 2:42-44. In support of this element, Citrix points to the three types of client information that could be used to allow or deny access to a conference: 1) conference ID, 2) minimum software version, and 3) the "cap" set by the user. Jeffay Invalidity Rep. ¶¶ 425-432. The conference ID feature allowed "for a measure of privacy on a public reflector," by allowing a user to set a conference ID number that other users would have to match in order to gain access. 3.00B1 Reflector ReadMe File at 2. Further, the 3.00B1 Reflector ReadMe File shows that CU-SeeMe had a "conference manager" function that allowed certain IP addresses to be

labeled as a conference manager, which could change the conference ID for specified conferences. 3.00B1 Reflector ReadMe File at 3.   The Court finds that this claim limitation is met.

### iv.   Dependent claims 4 and 5

The limitations of dependent claims 4 and 5 are also disclosed by CU-SeeMe. The URL limitation of claim 4 was discussed in Section B(7)(b)(iii), *supra*.  Again, the Court finds that the IP addresses utilized by CU-SeeMe meet the definition of "Universal/Uniform Resource Locator" pursuant to the definition of that term adopted by the parties. Claim 5 addresses the timing sequence of allowing access to the conference with respect to a "validation operation." The parties did not seek construction of "validation operation," nor does the specification offer additional clarity:

> [T]he server offering this listing or an associated server validates the conferee and provides information that allows the attendee client conferencing software to start and to connect to conference server 14 itself, possibly after further validation.

'489, 8:64-9:2.

When intrinsic evidence does not provide additional information about a claim term, the court may turn to extrinsic evidence, such as dictionaries or treatises. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).  The most relevant meaning of "validate" in the *Oxford English Dictionary* is "to confirm or to check the correctness of." *OED Online*, June 2012, Oxford University Press. The Court finds that ascertaining the IP address for the purposes of ADMIT and DENY functions, conference ID, and minimum software version are examples of validation.  As discussed in Section B(7)(b)(iv), supra, the packet loss rate for a client is monitored continuously to automatically adjust the cap, which may also be set by the user and changed throughout the conference. Therefore, the rate "cap" constitutes information allowing conference attendance that is received after the validation step. *See Martinson Decl. Ex. 35 at 19-25.* The Court finds this limitation was disclosed by CU-SeeMe.

Clear and convincing evidence shows CU-SeeMe disclosed all of the elements of the asserted claims of the '489 patent, and therefore the asserted claims are invalid for anticipation by prior public use.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Citrix's motion for summary judgment on non-infringement grounds.  In the alternative, the Court GRANTS Citrix's motion on invalidity grounds.

**IT IS SO ORDERED.**

Dated: August 13, 2012

_____
SUSAN ILLSTON
United States District Judge